3090120 Sierra Club and all accounts may be referred to the Illinois Pollution Control Board at all, and police may not be near or presential. Counsel for the appellant, you may proceed. Thank you, Judge. May it please the court, opposing counsel, all five of them, representatives of Sierra Club and Peoria Families Against Toxic Waste, and representative of Peoria Disposal Company, good morning. My name is David Wentworth, and I represent the opposition groups that we've been kind of labeled for the last three appeals, including this one, that have come before this court involving the same location, a hazardous waste facility located on the doorstep of Peoria. This is an interesting panel to be hearing this case. Justice Carter, you were the author of what we have called in our brief PDC No. 1, the case involving local siting authority before the Peoria County Board. And Justice Litton, you were on the panel of what we've been calling PDC No. 2, which was whether or not the waste that came out of the waste stabilization facility was generated by Peoria Disposal. Justice Wright, you're kind of both. You were the author of PDC No. 2 and on the panel of PDC No. 1. The reason why I bring that up at the outset is... And the only one from No. 3, I think. Correct. Correct. The reason why I bring that up at the outset is my clients are known commodities not only to Peoria Disposal in regarding this issue, but also known commodities to this court. They've expressed their interest in this issue throughout hundreds of comments in all three of the proceedings. They've retained experts. They've retained a lawyer. Their track record of involvement and documenting their concerns about how they believe that they have been adversely affected by the location, the continued operation of this location. This hazardous waste facility on the doorstep of Peoria is very well documented. In my brief... PDC is not challenging whether they're adversely affected, correct? In our brief, we have said that. Based on their brief... They're only challenging standing based on pardons. I believe... Not adversely. I believe they are challenging it on whether an adjusted standard is a rule. Might be a simple way to say it. If I may, I was going to lead off with standing, since obviously that's why we're here. Even though it's not necessarily jurisdictional, it does determine whether or not we are entitled to the release upon which we seek. No one ever saw it under like 41 to become a party to the proceedings, isn't that correct? Correct. Neither opposition group took advantage of the procedural rules of the Pollution Control Board to file a motion to intervene. Rather, we, from the beginning, knew of the direct route under Section 29 of the Act, which references Section 41. With the benefit of becoming a party, there's also a lot of bad things, including cost, including preparation. I understand that, but 41 talks about a party, and 29 is a reference to 41. Correct. And 41, again, requires a person to be a party for the appeal. But 29 uses the word person, and Section 41 uses the word party. By each statute referencing each other and saying that where there's a rule or regulation involved, it's not limited by the party status required in 41. As the Lake County Supreme Court case said, referencing that exact distinction between person party and referencing 41 and 29, they said that the legislature intended to do that, that they were discriminating in their choice of words. Clearly, we are parties. I'm sorry. Clearly, we are, my clients are persons. That is not disputed. Clearly, we participated in the proceeding, not necessarily to try to become a pseudo-party or to try to get through the back door, but rather to establish how we believe we are threatened by or will be adversely affected by this proposed delisting. Regarding standing, in addition, statutes must be evaluated as a whole, obviously. And two or more statutes on the same subject are presumed to be operative and harmonious. And that's the Cincus v. Village of Stinkneyville or Stinkney, Illinois Supreme Court case from a couple years ago. You know, can I, there's a Section 28.1, if you looked at that, with reference to the standing issue. It's a Part G. And, you know, in that case, 28.1A states that the rulemaking provisions of Title VII of the Act shall not apply to these decisions. And significantly, Section 29, providing for judicial review of rules and regulations, is the last section of Title VII. How does that impact all this? Because then that would not seem to. That's correct. If I may give a long answer to the court and then try to answer the question precisely. Sections 29 and 41 were on the books since the beginning of the Environmental Protection Act. Section 27 provided for site-specific or site location, specific location abilities to delist. But you had to go through the rulemaking procedures. It was a cumbersome and slow process. Under the Illinois rulemaking, it's 5 ILCS. Administrative procedure. Yes. There's a first notice and a second notice. You have to publish it in the Illinois Register. That's all exempted. Correct. Under 28.1. Correct. Correct. And what the, to streamline the ability to delist for a specific site, specific location, they didn't do away with the ability to do that still under Section 27. But they added 28.1. So this is a hybrid vehicle of changing an environmental standard, but for only one person. Or, you know, for one location. And the analysis of 28.1 pumping you back into 27A, saying that in promulgating regulations under this Act, you have to consider all the suitability of location, you certainly wouldn't, as a legislature, you wouldn't want to allow a big loophole to say, normally you have to go through all these rulemaking procedures. But if you do it under 28.1, you don't have to worry about it. I mean, it kind of covered, you know, they don't need to look at it at all. And the other section that you, you know, that I was coming to was the 28.1G, which says that any determination under the Act is appealed pursuant to 41, which, again, requires the party status. I respectfully disagree with, I think the main emphasis of it is obviously the party status, because that's the first run-on sentence that identifies who else. But then at the last sentence of 41A says nothing above 41A limits someone from appealing a rule or regulation of the board under 29. And those are all in the books at the time that they drafted 28.1. Now, let me get something very clear. There is every possibility for a person who wants to be a party in these proceedings to ask to intervene to become the party. Isn't that right? I mean, you said, well, there are some reasons, some practical reasons, costs and stuff like that, that we don't want to be a party. But there are people who are interested in the proceeding and give some testimony, and then there are people who are very interested and want to participate as a party. Correct. And usually people who appeal are parties, obviously, in most cases and so forth. Correct. Legally, there is no impediment about becoming a party, I mean, if you fit interested persons, right? In concept, yes. In practical reality, no way. There's not a reported decision of the board that allowed another party to intervene in an adjusted standard case. The two cases that were cited by Peoria Disposal in their brief on this issue, kind of doing a side, sloping into the issue, in both of those, the board said you can't intervene. In addition, there's another Midwest generation case, AS 2007-3, a couple years after the one that's cited by Peoria Disposal, that denied an environmental group's motion to intervene in an adjusted standards case. And that came out, I think, the same month that this delisting petition was filed. Where the statute affords a direct route to appeal, availing yourself of a board procedure to additionally add information or to participate is not required. The statute is what controls here, not whether or not in a permissive statute you may intervene, whether or not anybody took advantage of that. What can come back to bite you if you don't do that, we will candidly acknowledge, is if there's nothing in the record about how we believe we qualify for relief under 29A. And in that regard, the record is replete with information regarding who we are, why we think we're threatened, and what adversity we believe will happen by this delisting. The board order, all 103 pages of it, single-spaced, makes the comment, makes the finding, that the public participation in this case was, quote-unquote, exceptional. They had never seen an adjusted standards case with this amount of public involvement. As a specific example, members of the opposition groups suggested that dioxins and furans be added to the list of constituents of concern to be monitored and identified throughout the life of the delisting. Those were incorporated by the board. So we're not going to take credit for it. The board has its technical staff and expertise and probably would have done it anyway. But it certainly helped that we were, before the board issued the opinion, going on record saying, hey, wait a minute, these cannot be solidified. These two things cannot, they need to be separately monitored. I think it's important that you get on to the issues. I know the standing issue is a threshold concern, but you're going to run out of time here before you reach the issues. I really have a concern about the board order. If I could direct you to page 3. I'm sorry, page 3? 3, thank you. It's, I think, A3 of the appendix. It's the last paragraph on that page. The board says, they talk about the derived from rule. This electric furnace dust is hazardous because it's derived from. The treated dust is hazardous because it's derived from. And then they make a leap and they say that it is hazardous in the last clause because it is generated from the treatment of hazardous waste. Isn't that directly contrary to PDC 2, where the IGPA found that PDC was not the generator of this waste? It comes in as waste. It goes out as waste. And they do nothing to produce or create waste. To me, there is a fundamental flaw in this clause. Could you speak to whether it's hazardous because it's generated by the treatment process? Thank you, Justice Wright. The PDC number 2 is an unpublished opinion, so I did not want to lead with that, and it's a Rule 23 opinion. But you can go to the Pollution Control Board opinion to say the same thing, to speak on it, since this Court affirmed the board. In that regard, the stuff that comes out of the waste stabilization facility is waste that was treated and generated by a PRA disposal company. So that's how they get around, for example, the fact that they get this hazardous waste from six surrounding states, and they're the mecca and they bring it in. Typically, a delisting can only be for waste generated in Illinois under adjusted standards, but here they get it from— My problem is delisting is site-specific, and so if PDC claims it's generating the waste, then it's site-specific to Peoria. But if the generator lives in Wisconsin and Indiana and Kentucky, then that waste has to be delisted. We have ten sites that are bringing waste to PDC that can apply to delist.  Individually. And whether you can do that if you're out of state or not. Sorry. And so this is my concern. It appears to me the IEPA and the Pollution Control Board has forgotten what their ruling was before with regard to generation. And I have looked at the definition of generator under the EPA Act 415, and I've also looked at the definition of generator under the administrative code. And they require you to produce waste, or under the code you can be the first person that causes it to become hazardous. Correct. So do you share the same concerns that I have here? That you get, much like in a jury trial, you get a juror with a history. Here you have a justice with a history, and I can't ignore what the EPA has done in the past with regard to generating. Am I required to do so? I believe that you are, and I concur with your comments. But the fact that with a – I was going to get into that more with the local siting issue about under 39.2, whether this constitutes a new pollution control facility, and raise much of the same argument. Well, there's a way around that. If you delist the waste and then transfer it to a facility in Tazewell County that you control, then they may be able to avoid siting as a transfer station. Correct. Do they control those facilities in Tazewell County? Yes. Was that made known to the – Absolutely. I mean, that was a part of the record. They control it. So it's a way around siting yourself as a transfer station. Correct. If I may make – Yes. My apologies. I just wanted to make one final point, if I may indulge. Under those 27A factors, I believe that the Board committed an error of law by misinterpreting Section 27A as not requiring any burden of proof or justification by purely disposal on compliance with those factors. And the Board said in their opinion at page 80, which is A80 of the appendix, by its terms, however – and this is after we had put it in there that with all this body of information, PDC hadn't put anything in about how this process, with adding more roller cars hanging out on top of the existing facility 200 feet from the nearest house, how any of that would be impacted by this change of use of the waste stabilization facility. The Board slammed us and said, by its terms, however, Section 27A does not state a burden of proof or an evidentiary standard that must be met. Under Section 104.426 of the Board's own code, however, which is contained in the Adjusted Standards Regulations, it says, quote, the burden of proof in an adjusted standard proceeding is on the petitioner. A petitioner must justify an adjusted standard consistent with Section 27A of the Act. And that essentially quotes 27A. The statute does prescribe a burden of proof, a justification requirement, and expressly references the 27A factors. Another case before this Court, the United Disposal of Bradley case, says that a pollution control board cannot ignore its own rules. Respectfully submit that they did in this case by treating all the evidence that we had put from PDC No. 1 and PDC No. 2 back in the record in this case by saying that somehow that could just be disregarded because it was a different burden of proof or a different statute at issue. You can finish. Thank you. The Board's dismissal of references to prior cases for whatever reason still does not mean that PDC met its burden or that the Board fulfilled its statutorily mandated function. Thank you for the Court's time and attention. I have another question. I'm really sorry, but... Go ahead. Oh, please. The petition is required to list what lab is testing the samples, I believe. What lab is testing the samples? And perhaps a representative from Peoria Disposal, when they get up, can correct me. I believe it's PDC Labs, one of the family of companies of the petitioner. So the IEPA is not requiring an outside lab to test these samples? I don't know. I don't know, yes. Thank you. Thank you. Can you begin by answering my question? Does your petition identify which lab is producing and testing? Your Honor, I believe that the petition does identify the lab. The lab that is doing the testing now for the past year that this process has been in effect is Peoria Labs. It's Peoria Laboratories, Inc. It's an affiliated company with Peoria Disposal Company. It's a fully regulated and accredited lab. During the delisting process Are there other labs that are not affiliated with PDC that could do the same tests? There may be. I don't know, in terms of the industry, what's available specifically. During the testing and during the delisting petitioning process, an independent laboratory was used. Is it identified in the petition? I believe that it is. It wasn't specifically identified in the petition itself. It was identified in the process at some point during the procedures. An independent consultant was used to establish all the testing procedures and so on. They picked an independent lab to use to do the testing for the petition itself. Okay. And my concern is 720-122 subsection. I think it's… I'll get there. Well, it's on page 8-137 of the appellate appendix. It says the name and address of the laboratory facility performing the sampling or test of the waste has to be indicated in your petition to delist. And I couldn't find it. In that case, I'm sure it is in there. All right. Thank you. Because we were obviously very careful to discard all of those. So I'm sure it is in there. I've gotten a bit ahead of myself, but I'd like to introduce myself. My name is Jonike Nyer. Brian McGinnis and I from Elias McGinnis Rippon Seghetti and Claire Manning of Brown Hay-Stevens are representing Peoria Disposal Company. Also here at the Council table is John Schmidt from the Attorney General's Office, who is representing the Illinois Pollution Control Board and the Illinois Environmental Protection Agency in this matter. Our intention is that I will very briefly address the standing issues that have been raised and then I will turn this over to Mr. Schmidt for the purpose of engaging in more of a substantive discussion on the issues that have been raised in the appeal. Clearly, the Court has a grip on these issues generally and this delisting specifically. I must address something very briefly that Counsel stated when he came up before you a moment ago. He said that his clients are concerned about the continued operation of this location. That, quite simply, is not the issue in this case. This is a delisting case. This is an adjusted standard case. We're here for this case. The Court's familiarity of the members of this panel with the broader context, I think, is useful. You get a level of familiarity that may ease your transition into this somewhat difficult material, but it's not directly relevant. If we're going to talk about context in this case, I'd like to remind the Court that not a single governmental body opposed this delisting. Peoria County's own technical consultants found that there were no problems with the delisting petition. Tazewell County Board and the Hopedale Township passed resolutions supporting the petition for the delisting. Again, from a substantive standpoint, no one has pointed to anything that says that this process doesn't work. What we're doing is taking hazardous waste and making it non-hazardous, and I think that should be encouraged. But to focus on the standard issue. Shouldn't it be encouraged that you're bringing in waste from other states, claiming it as your own in Illinois, and then under the regulations you have to manage it in Illinois? I mean, I agree with you. Delisting is a good thing, but you have to begin with a site-specific procedure to delist the appropriate waste stream. We believe that this is a site-specific delisting, and I don't know that that was briefed extensively by the parties in this matter, but clearly the Pollution Control Board agreed, and they felt that this was an appropriate use of the delisting process. This is waste that may very well have been landfilled in Peoria in any case, in its hazardous form. Instead, it's non-hazardous. I think this is a public policy goal in favor. Well, the only reason it can't be stored in Peoria County in a hazardous waste site is because PBC has reached their capacity. Not necessarily, Your Honor. I'm sorry, but... Okay, go ahead. Tell me where I'm wrong. Well, I don't want to address the substantive issues too much, but suffice to say that the law provides for this process. It is to be encouraged from both a parochial view of our backyard and also from a nationwide view. This is a process that is recognized by the U.S. EPA, the IEPA, and so on, and it is an overall and net good, and I think you would agree with that, Your Honor. You have one minute. Oh, thank you. Well, it's a very good way to address the standing argument. Which we're expecting entirely from the standing committee. Yes, I will elucidate it entirely for you now. I think that Justice Carter pointed to the correct provisions in his questions, which is 28.1G states, a final board determination made under this section concerning delisting may be appealed pursuant to Section 41 of this Act. Section 41 lists five specific categories of potential appellants. Mr. Wentworth admits that his clients fall into none of those five specific categories. Instead, pointing to a general incorporation of Section 29A, which states that any person adversely affected or threatened by any rule or regulation of the board may obtain a determination of validity or applicability of such rule or regulation by petition for review under Section 41 of this Act. So even on its face, it's limited by Section 41 of this Act, which I think is the only real way to harmonize those two provisions. Furthermore, we don't believe that this is a rule or regulation of the board. And interestingly, the board and the hearing officer ruled on this specific point concerning the need for the potential for having two separate notices and two separate public hearings, as was pointed out in our brief. Furthermore, on its face, Section 28.1A states that this is an adjudicatory determination. And that is why Section 41 applies rather than Section 29. If I could just finalize my one thought. As Justice Carter pointed out, they could have, the petitioners could have availed themselves of the ability to petition to become parties to this case. And they elected not to do that. As a result, there really isn't a record before the board of how these individuals are personally adversely affected or threatened by any potential ruling by the board in this case. They chose not to avail themselves of the procedural mechanisms that are in place to allow this to be done in a reasonable and linear manner, instead attempting to introduce new evidence before the court, which the court properly denied earlier in this proceeding. So for those reasons, we believe it's clear that they simply don't have standing to pursue this appeal. And I would like to turn it over to Mr. Schmidt to address the substantive issues, if the court doesn't have any specific questions. I do have a question. Under the adjusted standard provision, it says the effect of an adjusted standard is to create an environmental regulation. How do you address that? I think it's 404. Yes, Your Honor. The regulations taken as a whole, and the law taken as a whole, the actual act taken as a whole, clearly show that there are two animals at play here. So one is the regulatory rulemaking animal, and the other is the adjudicatory animal. And I think 28.1 couldn't be clearer. And, again, 28.1 is the statute that sets forth what precisely an adjusted standard is supposed to be and what it's supposed to do. And it states just that it's after adopting a regulation of general applicability. The board may grant in a subsequent adjudicatory determination an adjusted standard. And an adjusted standard is not a regulation when you take into consideration 720 Section 104-440? I don't believe so, Your Honor. I think that the way that these processes are set up, it's a different animal. I suppose you could call it an individual's regulation is sort of what I think you're alluding to. But the guys who know, the guys who pass this administrative regulation says an adjusted standard is a regulation. But it is not a regulation of the type that would be subject to Rule 29. It's simply not. Rule 29 is a different, it relates to statewide rules and regulations. And the onus of the entire act taken as a whole, and of all the regulations taken as a whole, clearly support that determination. I understand your position. Thank you, Your Honor. Are there any other specific questions I can answer about standards? Thank you. Thank you. May it please the Court. John Schmidt on behalf of the Pollution Control Board. We, at the outset, we do agree with Peoria disposal on the standing issue. But I'm going to proceed to the merits. And I want to draw the Court's attention to page 91 of the Court's order toward the bottom of the page. And it says this adjusted standard is provided only for the residue resulting from the treatment of K061 RCRA listed hazardous waste using PDC's new proprietary stabilization technology described in the delisting petition. So this adjusted standard does not apply to the EAF dust. It only applies to the residue. Once it has been treated by Peoria disposal. And Peoria disposal is only allowed to consider it non-hazardous if the testing for that particular batch shows that there are no unsafe levels of the 16 constituents of concern for which the EAF dust residue must be tested. So the adjusted standard, the delisting is applicable only to the residue that results from PDC's treatment of the chemicals or treatment of the EAF dust. What provision of 122 did you consider this petition to be filed under? Because the petition does not identify whether they're requesting delisting under 122 subsection A or B. But the Board's order seems to be treating it as a 122B petition. Is that correct? Your Honor, I want to look at 122A and B. I believe it's correct, but I'm not 100% certain on that. But I believe the Board did treat it as a B petition. I think that's correct. And I want to emphasize that in connection with the delisting, the Board did impose several conditions to protect the public safety. And Mr. Wentworth was a little reluctant to have his advocacy group take credit for one of them. But I think they do deserve some credit. I think the Board did listen to the public on this and incorporate. It certainly, in its decision, addressed the numerous public comments that were made very thoroughly. And it incorporated the suggestion regarding the concern regarding dioxins and furans by putting a condition in that the testing of each batch must include dioxins and furans. Because those compounds had been present in some of the implant trials that the prior testing had been done, but not at unsafe levels. Nevertheless, the Board did require that. And it added some other important conditions to those that were in PDC's delisting petition. One of them requiring that the residue be disposed at a licensed landfill here in Illinois that would have a groundwater monitoring and leachate collection system. Are they testing only the residue? Yes, they're testing the residue after it's treated using the process that Dr. Chada redeveloped. Under subsection B, the testing is supposed to be on the mixture as a whole, the mixture of solid waste and one or more of the listed hazardous waste. It has to be as the whole, but they're only testing the residue? The residue, to me, implies there's something smaller left over after they treat it? Well, only the residue is allowed to be treated as non-hazardous. What is the residue? The residue is the product that results after the dust is treated. Which is larger than the dust that is treated, larger in volume. Counsel's nodding. Yes, it is. Don't you think it would have been reasonable to have an outside lab test rather than allowing PDC to test? Wouldn't that be a reasonable condition? No, I understand your concern there, but this testing procedure was developed in consultation both with the IEPA and there was some consultation with the U.S. EPA as well. And delisting risk assessment software from the U.S. EPA was used in the process. So this is a situation where the data is certainly subject to examination and evaluation by the IEPA and the IEPA agreed that this petition should be updated. Is this treated residue still hazardous even though it's excluded? No, it's not hazardous. It's considered non-hazardous? And Peoria Disposal may then dispose of it as non-hazardous waste. Which allows them potentially to avoid the need to re-site as a transfer station. Was that all discussed and disclosed to the board when you made this decision? Well, the board really did not decide whether they would need to do that. The board left that issue alone in its decision. What definition of generator is the board applying? The definition under the regs or the definitions under chapter 415? I'm not certain about that. Is there any regulation, statute, or other requirement that someone, some totally independent group, about monitoring their testing? No, I don't believe there is, Your Honor. And is this a standard practice when you have something this technical to have sometimes an in-house, that is in-house for the firm that's involved, do some of the testing because of the complexity? Yes, it is, Your Honor. And saying that, I certainly understand Justice Wright's concern. But yes, it is. I wasn't asking about the concerns. I was asking about the mandates. We'll talk about that later. But yes, it is a standard practice, Your Honor. And since I just have two minutes, I'll just stop. Probably only one now. That was a minute ago. And the board, the CDCR Club has suggested that the board did not consider the Section 27A factors. But as we've mentioned in our brief, the board's decision on page 81 specifically says that those factors were considered. And in addition, there is a fairly extensive discussion of public comments relating to those factors, especially public comments relating to the possibility of air pollution and to the two aquifers that are located nearby and that provide drinking water for much of central Illinois. The Granite City case says that it's not really set forth and merely says that those factors have to be considered and doesn't set forth a particular amount of evidence that must be provided. So in conclusion, we agree with Peoria Disposal that the opposition groups lack standing. But if this court does decide the merits of the case, we would ask that the board's decision be upheld. I know you feel like I'm beating you up. No, I don't. I actually don't. I've been beaten up worse. But I only have an opportunity to ask questions of you while you're here. Certainly. In considering those Section 27 factors, if I understand correctly, the waste stabilization facility is now a containment building and all the stabilization takes place under one roof. Now, once the conditions applicable to the delisting go into place, there's the potential for multiple boxcars of untreated waste to be waiting for treatment outside of that containment building in the footprint of the landfill that is now full. Did you consider the risk of those boxcars waiting to be treated? I believe the board did consider that. And one thing that the board did state in response is that I think the risk that could come from that would be more in the nature of air emissions. And the board's decision indicates that really that is not the primary danger from EAF dust. The danger is more the possibility that it would be in a landfill and leach into groundwater. So that's one thing the board said. And the board also mentioned that PBC is still subject, and I think this is an important point, PBC remains subject to the board's regulations and to the statutory provisions regarding air pollution. So if there are emissions that can be detected, an action can be taken to stop that. And to follow up, and I'm not trying to bruise you further, but the IEPA denied the request to expand the landfill vertically. But now IEPA and the Pollution Control Board is allowing the landfill to house boxcars above the landfill on the footprint of the old landfill. How is that not a vertical expansion? It's just not covered by dirt. Well, the boxcars really are not, I think as Your Honor pointed out, they're really not going into the landfill. They're just temporarily on site, and they are going to leave the site. The material that goes into the landfill stays there. And in addition, again, with this particular waste, the main danger is once it gets underground, if the main danger that can result from it is leaching into groundwater or something like that, which in this case has not happened. Peoria Disposal has been operating that landfill for a long time, and there has been no groundwater contamination or no contamination of the aquifers. Thank you. Thank you, Your Honors. Your Honor, I'm sorry, this is irregular for me to make a comment, but just as a point of clarification, I wanted to, just as a point to understand, the boxcars with this waste that are coming in for treatment are never left outside. There are no boxcars. What is being left in the footprint of the landfill, then? During the cure period, my understanding is that after treatment, there's a brief period during which there may be containers at the landfill. Those are removed. Those are not ever left there. It's not a process where there's waste coming into the facility that is simply sitting in boxcars. And I apologize again for the interruption. I only get one chance to ask these questions of you. We didn't have only one chance to respond, and so that's why I did not want to allow that misconception. So help me understand the 60 boxcars potentially that are sitting in the footprint contain treated and potentially delisted and now non-hazardous waste? That is correct, Your Honor. There would never be a circumstance where untreated waste would be allowed to remain on the site without being immediately treated. The boxcars that are discussed- How long is the curing process? The curing process, I believe, can vary somewhat, but it is a matter of, I believe, days. And I'm sorry that there's some confusion. I really have tried to prepare and go through all the materials. I was impressed, Your Honor. You certainly understand the material very well. And I apologize. No, thank you. And I apologize for the interruption. Thank you. Justice Carter is used to these unusual things that happen when I'm on the field, so my apologies to him. But you should be behind closed doors and hear some of our debate. With that, counsel, you may proceed. Thank you. In my four minutes and 45 seconds, to get back to your question right out of the box, Justice Carter, about rule or regulation, whether we have the standing under the Section 41A, the Swenson-Spreader case establishes that we have standing. The Swenson-Spreader case establishes that an adjusted standard is a quasi-legislative function of the board in interpreting and applying a law. To me, that's a regulation. In addition, in the Swenson-Spreader case, the court said that, therefore, the board is entitled to a super high standard, arbitrary and capricious, because it's a legislature. It's acting as a legislative body. Based on that, Swenson-Spreader establishes that the elements of an adjusted standard, it's a hybrid. Some parts are adjudicatory, are the facts there. But others are uses of the board's expertise and judgment, and you can trace that back to the beginning of the 1970 Constitution. The case negates 28.1, which refers to adjudicatory facts and the lack of applicability of Title VII. I respectfully submit that the – what's the year of the case? 1999. 1999, 1998. That was right after the Belvedere case, which started the streamlining of the standards of review that you did in PDC No. 1 for that case. Regarding the – in my brief period of time, regarding the 27A factors being not relevant to this case, 27A says they're relevant, says they – the petitioner must establish the justification consistent with them. The mere recitation by the board of what our concerns were and then striking them or saying that they were not sufficient by relying on other statutes and relying on the agency out there being the watchdog, I believe is an advocation of the board's responsibility to look at 27A. Mr. Schmidt said that in referencing this issue that the – well, let me just get to the point. The Peoria Disclosal Company had the burden under 27A, not the board. Granite City, the Supreme Court case that had addressed it, was whether or not the board had the duty to interpret and to use its technical expertise and to set forth the factors. And the courts – the Illinois Supreme Court said, no, the board, in acting as a legislative body, a quasi-legislative body, doesn't necessarily have to put all that down. The board, in their brief, then cites a couple of cases, including one from the 3rd District here, that I believe, Justice Wright, you were on the – you concurred because the rule was there but didn't really like it. But in this case, that – That sounds like me. But in the case before this court, the fact is that PDC has the burden, not the board. The board, in its opinion, treated it as if the board didn't have to do anything and didn't recite anything in the application, all those boxes of volumes in the clerk's office. There's nothing in there about how this will impact the existing facility. There's a ton in there about Indian Creek, about where it's going to go. But, as Justice Wright was saying, there are opportunities for exposure pathways, opportunities for the stuff to get out while it's at the site, prior to treatment or during treatment. Thank you. In the application, in the petition filed by Peoria Disposal, they said that sometimes you need to re-treat this stuff, that it doesn't make it to the delisting standard. That would then go back into the facility and then back out to cure some more. And it can get over-treated. It can – you know, so this is a continuing process to get back to Justice Wright's comments. The Peoria County Board hired a consultant to see if this passed the smell test. Patrick Engineering said it did because Illinois has an integrated regulatory system with the agency and the board. Let's not invest resources. Let them do it. Unfortunately, the board here let us down by not following its responsibility, by not following the law under 27A, and not addressing a lot of the compatibility concerns based on the wealth of knowledge that was before the board. Coupled with the fact that the applicant really didn't include a section in their adjusted standard petition on this point, to after the fact try to come up with stuff to make it stick falls way short. A cursory review of the Pollution Control Board website on adjusted standard petitions finds that on several of them, there are specific – if you're in the other petitions filed by other parties, they go through the 27A factors for where they're doing their business. So we respectfully request that the court reverse the – or vacate – Let me ask you a question about the standing issues. And I'm not sure if I'm pronouncing your name correctly. Nair? Nair. Ms. Nair referenced the 27A regulations as a different kind of regulation, like a sub-quality regulation or something like that. It was not applicable statewide and it wasn't. It didn't go through the regulatory factors, at least such as they are in 28A. Were the procedures correct? Correct. Do you agree with that? What is your response to that? It's a different kind, but I mean, does that make it less effective as a regulation? No, it gets published in the regulations. It becomes a permanent part of the Illinois environmental regulations. This delisting will become a part of the regulations, for one thing. In addition, as the brief set forth, there's this adjudicatory moniker that's included in 28.1A and included in all the board regulations about adjusted standards that says that the type of proceeding is adjudicatory, mainly as a distinction so that you don't have to go through all the rigmarole and notice under a public rulemaking process to streamline the system. To then use that adjudicatory label to try to somehow say on standing that it's not a rule, but then in the standard of review section of their briefs to say that it is a rule, therefore entitled to the higher deference, they can't have it both ways and the law doesn't provide it both ways. The law says in Swenson's spreader that the quasi-legislative part of an adjusted standard petition where the board uses its technical expertise and judgment in interpreting law and the facts before it constitutes quasi-legislative and therefore results in a regulation. So I disagree with the statute says what it says, but I disagree with the import. Thank you.  Thank you. Thank you, counsel. The court will take this matter under advisement and rule will summon dispatch.